**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MICHAEL A. VALDIVIA, JR., as Personal Representative of the Estate of Michael A. Valdivia, Sr., deceased,**

    **Plaintiff,**

**-vs-**                  **Case No. 6:06-cv-943-Orl-22KRS**

**UNITED STATES OF AMERICA,**

    **Defendant.**
_____

**MEMORANDUM OPINION AND ORDER**

This is a wrongful death action filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. Plaintiff Michael A. Valdivia, Jr. seeks damages from the United States for the alleged wrongful death of his father, Michael A. Valdivia, Sr., who, prior to his death from cancer, was under the care of physicians at the Veterans Affairs Medical Center ("VAMC") in Miami, Florida. Plaintiff claims that VAMC physicians failed to subject his father to regular colon cancer screenings, and, as a result, his cancer was not detected until it had reached an incurable stage, leading to his untimely death from the disease. After a three-day bench trial held from June 30 to July 2, 2008, the Court now renders its decision on the merits.

**I. BACKGROUND**

The basic facts of this case are drawn from the parties' joint pretrial statement, as well as the medical records received at trial. These facts are undisputed except where noted. Michael A. Valdivia, Sr. retired from the United States Air Force in 1978 after more than 25 years of military service. In late 1988, Valdivia was stricken with a serious neurological illness that was

later determined to have been caused by arsenic poisoning.  Valdivia never fully recovered from the illness.  For the remainder of his life, he was largely confined to a wheelchair and suffered from numerous other physical impairments.

In 1992, Valdivia married June Stewart, a hospital volunteer whom he had met while receiving long-term care at the VAMC, and the couple settled in Aventura, Florida.  Some time later,[1] Valdivia began receiving home-based care from VAMC practitioners and nurses as part of the United States Department of Veterans Affairs Home Based Primary Care Program ("HBPCP").  The HBPCP enabled patients who had difficulty commuting to the VAMC for appointments to receive primary care services from VAMC physicians in their own homes.  On a regular basis, VA nurses and physicians provided Valdivia with routine care of his various physical ailments[2] by coming to his home to conduct checkups, collect lab specimens and prescribe and dispense medications.  Sometime in 1996, Valdivia began to make occasional visits to the physicians at Lifetime Healthcare of Aventura ("Aventura"), whose offices were only a few blocks away from his home.

It was not until 2001, when he was 69 years old, that Valdivia received his first colon cancer screening.  In July of that year, the physicians at Aventura administered a fecal occult

---

[1] The year in which Valdivia was enrolled in the program is unclear.  Plaintiff asserts that his father was enrolled in 1993, while the United States maintains that Valdivia was not enrolled until 1997.  The Court is unable to resolve the dispute, as there is a gap in Valdivia's VA medical records spanning the years 1993 - 97.  Further, the Court need not resolve the dispute, as Plaintiff does not assert that Valdivia's cancer would have been detectable prior to 1997.

[2] Valdivia was being treated for, among other things, an enlarged prostate, chronic constipation, hypertension and various incidences of skin cancer.  Pl.'s Ex. 1 at 105, 185.

blood test ("FOBT").[3] Pl.'s Ex. 2 at 46, 49. All results tested negative for blood.[4] *Id.* In September, 2001, VAMC physicians also administered an FOBT. All three of these samples tested negative. In February, 2002, however, when Valdivia submitted three more FOBT samples to the VAMC, one of the samples returned a trace positive result. No further action was taken by the VA physicians at that time. A few months later, Valdivia was admitted to Aventura Hospital with gastrointestinal bleeding. Physicians conducted a colonoscopy and diagnosed the bleeding as a symptom of colon cancer, which had spread to adjoining lymph nodes and into Valdivia's liver. Valdivia subsequently underwent two surgeries to remove the cancerous tissue from his colon and liver, but declined further treatment and eventually succumbed to the disease in late June, 2003.

## II. LEGAL STANDARD

In a negligence action under the Federal Tort Claims Act, the law of the place where the alleged act or omission occurred controls. 28 U.S.C. §§ 1346(b), 2674. The alleged negligence in this suit occurred at the VAMC in Miami, Florida; therefore, Florida law governs.

Florida's medical negligence provisions dictate that "the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider

---

[3] The FOBT requires a patient to take small stool samples on three separate occasions and submit them to a physician for laboratory testing. In the lab, a few drops of developer are added to the samples and if they turn blue, the sample is positive for blood. Blood in the stool can be an indication of the presence of a cancerous or precancerous polyp or lesion in the colon.

[4] There is some confusion as to whether Aventura physicians collected three or six samples from Valdivia on this occasion. Even Valdivia's treating physician at Aventura at the time the samples were collected was unable to discern whether three or six samples had been taken. Lynch Dep. at 61-63.

represented a breach of the prevailing professional standard of care for that health care provider." F.S. § 766.102 (1). Further, except in cases where a surgical instrument or supply has been left inside a patient's body after surgery, there is no presumption of negligence; rather, "the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider." F.S. § 766.102 (3). To establish proximate cause in Florida, a plaintiff must prove that the defendant's negligence more likely than not caused the plaintiff's injury. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

## III. ANALYSIS

The issues in this case are straightforward. First, the Court must determine the standard of care applicable in this case. Then, the Court must decide whether Miami VAMC physicians breached the standard of care at any point during the time Valdivia was a VAMC patient. Finally, if a breach occurred, the Court must then decide whether that breach proximately caused Valdivia's death. To assist the Court in making these determinations, each party presented the testimony of an expert witness at trial. Plaintiff's expert was Dr. Steven R. Peikin, Head of the Division of Gastroenterology and Liver Disease at Cooper University Hospital in Camden, New Jersey. Defendant offered the testimony of Dr. Michael D. Hellinger, a board-certified colon and rectal surgeon practicing in Miami, Florida.

**A.     The Standard of Care**

While the two experts ultimately diverged in their opinions regarding the specifics of Valdivia's case, they generally agreed that the standard of care for colon cancer screening had remained fairly consistent over the years. Both experts opined that colon cancer screening

should start once a normal-risk patient reaches the age of 50, and could be achieved by any one of several methods: (1) colonoscopy administered every ten years; (2) sigmoidoscopy administered every five years; (3) barium enema administered every five years; or (4) annual fecal occult blood testing.[5] The experts agreed that the FOBT, which was the recommended method at the VAMC,[6] was the least sensitive test, as colon tumors only bleed intermittently, e.g., if they have been traumatized by passing stool or have become ulcerated due to constraints on their blood supply.  Even so, both acknowledged that if the VAMC physicians administered FOBTs annually to normal-risk patients over 50, they would be meeting the standard of care.  Further, should an FOBT sample come back positive for blood, both experts agreed that the standard of care would require a primary care physician to refer the patient to a specialist for a follow-up examination using one of the other more sensitive screening methods, such as barium enema, colonoscopy or sigmoidoscopy.

Based on the agreement of the parties' experts as to the standard of care, the Court finds that during the time Valdivia received care from the VAMC, any one of the following methods, if administered at the indicated intervals once a normal-risk patient reaches the age of 50, would have met the standard of care: (1) colonoscopy administered every 10 years; (2) sigmoidoscopy administered every 5 years; (3) barium enema administered every five years; or (4) annual fecal

---

[5] Both experts indicated that these methods could also be used in combination with one another.

[6] In 1991, as part of its Preventive Medicine Program, the VA recommended that all general outpatients age 50 or greater be screened for colorectal cancer. Def.'s Ex. 7; Pl.'s Ex. 46. Such screening was to take the form of a fecal occult blood test administered "every 1 to 2 years beginning at age 50." Def.'s Ex. 7 at 14; Pl.'s Ex. 46 at 14.

occult blood testing. Further, the Court finds that during the time Valdivia received care from the VAMC, the standard of care would have required referral to a specialist for administration of a more sensitive screening mechanism, such as barium enema, sigmoidoscopy or colonoscopy, whenever an FOBT sample returned a positive result.

**B.     Breach**

Having defined the standards of care applicable in this case, the Court now proceeds to consider whether VAMC physicians met those standards. There are two relevant time periods to consider: (1) 1981 - 2001; and (2) after the VAMC trace positive FOBT result in February, 2002. With respect to the first time period, the evidence at trial showed that Valdivia did not receive any form of colon cancer screening until July, 2001. Both Dr. Peikin and Dr. Hellinger agreed that the complete failure to screen Valdivia for colon cancer until he was 69 years old was a clear breach of the standard of care. The Court therefore finds that, prior to 2001, VAMC physicians breached the standard of care by wholly failing to screen Valdivia for colon cancer.

With respect to the second time period, the evidence at trial showed that the VAMC did not offer any follow-up screening to Valdivia after one of his FOBT samples returned a trace positive result for blood in February, 2002. Both experts agreed that VA physicians should have conducted a follow-up colonoscopy, sigmoidoscopy or barium enema to ensure the positive result was fully investigated, and both concluded that the VAMC's failure to do so breached the standard of care. Therefore, the Court finds that VAMC physicians breached the standard of care by not referring Valdivia to a specialist for further testing after receiving a positive FOBT result in February, 2002.

**C.     Proximate Cause**

Having found that the standard of care was breached during both relevant time periods, the Court now considers whether either of these breaches was the proximate cause of Valdivia's death. Interestingly, but perhaps not surprisingly, after reviewing identical evidence in the case, i.e., Valdivia's VAMC and Aventura medical records, Dr. Peikin and Dr. Hellinger came to two different opinions with regard to causation. Though their ultimate opinions differed, the experts did agree on the various mechanisms by which colon cancers can develop. According to the two physicians, most colon cancers start from a benign tumor called an adenoma. Over several years' time, and through a series of DNA mutations, an adenoma can transform itself into a cancerous polyp, called an adenocarcinoma. There are a few known exceptions to this general progression, however. One exception exists for people who have long-standing ulcerative collitis or inflammatory bowel disease. In those cases, an adenocarcinoma can form directly from the cells of the colon and develop much more quickly. Further, individuals with certain genetic predispositions for colon cancer experience the transformation from adenoma to adenocarcinoma much more quickly. Finally, in rare cases, tumors known as non-polypoid colorectal neoplasms develop directly from normal colon cells, perhaps only within a year's time, and are deeply invasive at an early stage.[7]

With respect to the VAMC's failure to refer Valdivia to a specialist after his positive FOBT result in February, 2002, the experts agreed that had the VAMC met the standard of care at that time, it would have made no difference in Valdivia's prognosis because the cancer had

---

[7] Although Dr. Peikin did not directly identify this type of cancer as an exception to the general adenoma to carcinoma progression, he admitted on cross-examination that he was aware of non-polypoid colorectal neoplasms but thought them to be very rare.

likely already progressed to the incurable stage at which it was ultimately detected two months later. Based on this evidence, the Court concludes that the VAMC's failure to meet the standard of care after the February, 2002, positive FOBT result was not the proximate cause of Valdivia's death.

The experts were less agreeable as to whether the VAMC's failure to meet the standard of care prior to 2001 was the proximate cause of Valdivia's death. While neither physician found any evidence in the medical records that Valdivia suffered from ulcerative collitis, inflammatory bowel disease or was genetically predisposed to developing colon cancer, each physician had his own theory as to the method by which Valdivia's cancer developed. Plaintiff's expert, Dr. Peikin, concluded that Valdivia's cancer likely arose from a benign polyp which had taken the years-long path of most colon tumors from adenoma to adenocarcinoma. When questioned about the physical characteristics of the adenocarcinoma found in Valdivia's colon, which was described in the pathology report as an "ulcerated plaque like pinkish gray tumor measuring 2.5 x 1.5 cm," Def.'s Ex. 2 at 114, Dr. Peikin explained that polyps could take at least two distinct shapes, polypoid (round) or sessile (flat or plaque-like). Dr. Peikin further explained that while flat polyps were generally more likely to turn into cancer, he was aware of no difference in growth rate or level of invasiveness as compared to round polyps. Having said that, Dr. Peikin concluded that Valdivia's cancer likely originated from a flat polyp that developed from an adenoma over a number of years and could have been detected by a colonoscopy as early as 1999. Dr. Peikin was not able to confidently conclude that the polyp would have been detected in any given year by fecal occult blood testing, due to the fact that colon polyps only intermittently bleed.

Defendant's expert, Dr. Hellinger, had a different view. Dr. Hellinger believed that Valdivia's cancer likely arose from a rare non-polypoid colorectal neoplasm, which aggressively spread to Valdivia's liver at an early stage. Dr. Hellinger primarily based his opinion on the pathology report's description of the tumor as a small, poorly differentiated, plaque-like lesion. According to the doctor, non-polypoid colorectal neoplasms fit this description, tending to be relatively small, flat lesions that have largely lost the appearance of normal colon cells. Further, Dr. Hellinger noted that the cancer appeared to have spread to the lymph nodes and liver at a small stage, and, once spread, appeared to grow fairly aggressively. He further observed from the medical records that within a matter of months after surgeons removed the cancerous tissue from Valdivia's liver, several new cancerous growths were detected. Therefore, based on the colon cancer's growth characteristics, and the rapidity of the re-growth of the cancer in Valdivia's liver, it was Dr. Hellinger's belief that even if physicians had administered an FOBT, or any other screening mechanism, prior to 2001 they would not have detected any cancer because the cancer was either not yet present or was too small to detect at that time.

At the end of the day, both experts appeared knowledgeable, credible and highly qualified to render opinions in this case, and both provided plausible explanations for how and why Valdivia's cancer eventually killed him. Yet, Dr. Hellinger's account of a rapidly-developing, highly-invasive cancer that arose from normal colon cells in less than a year's time proved more persuasive in the end. While the Court is mindful of the relative insensitivity of the fecal occult blood test, Dr. Hellinger offered a clearer explanation for how six, or perhaps as many as nine, FOBT samples taken in 2001 returned negative results. The cancer was simply too small to produce blood at that time. Further, Dr. Hellinger's theory provided a convincing explanation

for the aggressiveness with which the cancer returned to Valdivia's liver after surgeons removed the initial tumor.

In sum, having accepted Dr. Hellinger's opinion as the more persuasive theory, the Court believes that even if the VAMC had screened Valdivia for colon cancer, by FOBT or any other mechanism, in the years leading up to 2001, his cancer would not have been detected. Therefore, the Court concludes that the VAMC's breach of the standard of care prior to 2001 was likely not the proximate cause of Valdivia's death.

In finding for the Defendant in this matter, the Court does not intend to minimize the fact that Valdivia's family has suffered a great loss. Indeed, it became clear to the Court over the course of the trial that Valdivia left behind two devoted sons and a wife who had selflessly committed more than ten years of her life to the care of her husband. Valdivia was lucky to be surrounded by such caring people. However, the Court is duty-bound to follow the law without regard to sympathy, and in this case the law simply didn't support a finding for the family.

## IV. CONCLUSION

Based on the foregoing, the Court finds in favor of the Defendant, United States of America. The Clerk is directed to enter judgment for Defendant and close the case. It is further **ORDERED** that Defendant's oral motion for judgment as a matter of law, made during trial, is **DENIED** as moot.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on July 14, 2008.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record